608 So.2d 695 (1992)
Kimberly Nell Hamm McAdory
v.
James Edward McAdory, Jr.
No. 91-CA-0855.
Supreme Court of Mississippi.
September 24, 1992.
*696 G. Jyles Eaves, Eaves & Eaves, Louisville, for appellant.
J. Niles McNeel, David E. Bane, Jr., McNeel & Ballard, Louisville, for appellee.
Before HAWKINS, P.J., and SULLIVAN and BANKS, JJ.
BANKS, Justice, for the court:

I.
In the present appeal, we are called upon to review the level and quantum of proof necessary to support a finding of adultery. Kimberly Nell Hamm McAdory (Kimberly) appeals a judgment of the Winston County Chancery Court granting to James Edward McAdory, Jr., (James) a divorce on the ground of adultery. Finding that the evidence below did not rise above mere suspicion, we reverse not only the finding of adultery, but the other rulings emanating from that finding. We affirm the portion of the opinion granting James a divorce on the ground of cruel and inhuman treatment.

II.
Kimberly and James wed on January 13, 1987, and lived together until they separated on December 8, 1990. One child, James Edward McAdory, III (Jamie), whose date of birth is January 6, 1990, was born to the couple. Shortly after separating from Kimberly, James filed a "Bill of Complaint for Divorce" alleging three grounds in support: (1) uncondoned adultery, (2) habitual, cruel and inhuman treatment, and (3) irreconcilable differences. James also requested custody of the minor child.
Kimberly moved for dismissal of the complaint because it did not state a cause of action. She denied all other material allegations of the complaint, except to admit that irreconcilable differences existed between the parties. In addition, she filed *697 a cross-complaint for divorce alleging cruel and inhuman treatment and irreconcilable differences. She requested custody of Jamie and support payments and alimony from James.
Kimberly filed an amended complaint and cross-complaint on January 11, 1990. James answered the allegations of the cross-complaint, denying all material allegations, except to admit that irreconcilable differences existed between the parties.

III.
After separating from her husband, Kimberly moved in with her parents. The separation was precipitated by pictures and notes James found in Kimberly's purse. Six of the twenty-seven pictures introduced into evidence show Kimberly in various forms of embrace with a male co-worker; another three show her and this same co-worker playing and joking with each other.
The notes were addressed to Kimberly from different men. None are from the co-worker in the pictures, or any other person about whom there was evidence other than the notes. After happening upon the pictures and notes, James confronted Kimberly who explained that she and a co-worker, Ophelia Doss (Doss) who was pictured in at least one of the photographs, jointly paid to have them developed.[1]
According to Kimberly, all of the pictures were taken the same day. Later, she testified that the photos were taken on at least two different days. She identified the man in the photographs as John Wesley Hughes (Hughes), a co-employee who worked in the same department as she before she was moved to another section. Kimberly denied any romantic involvement with Hughes. Specifically, she testified that they were not having an affair and not sexually involved. "We just worked together and all of us got along back there." She explained that the pictures showing her and Hughes standing close to her with his arms around her shoulders and her arms around his waist were taken when they were "joking around." In one picture, she is shown making an obscene gesture.[2] She explained that she was making that gesture toward Doss. She could not remember if Hughes was present when the photograph was taken. Hughes is not pictured in that photograph.
Kimberly stated that Hughes visited her home on one occasion. Her husband was not home. Hughes was accompanied by Doss and they visited for approximately forty minutes. Kimberly testified that Doss and Hughes came to her home because Doss wanted to see it. She explained what happened after they arrived.
We was in the living room and I told her that I needed to go to the bathroom that they could go on and look through the house and that I would be out in a minute.
Q. Then what occurred?
A. Well, they was looking through and, uh, this is what she told me later on, was when they was in the bedroom, he said that he was hot and he was going to take his shirt off, and she told him if he did that she would take his picture, and she did, and I didn't know anything about it until they come back and I seen it.
Kimberly stated that she neither saw Hughes without his shirt nor was she in the room when the picture was taken. The picture shows Hughes lying in the bed that Kimberly and James shared, wearing some type of shorts. According to Kimberly, Hughes said he disrobed because he was hot. Another picture was taken of Hughes in the living-room. At the time of trial, Hughes was in the military and stationed away from Winston County. Kimberly stated that Doss took all the pictures. Doss, however, is not shown in any of the pictures taken in the house during that visit.
*698 In one photograph, Kimberly is pictured wearing a brown leather jacket. She testified that the jacket belonged to Hughes, but denied that he gave her the jacket to wear or was present when the picture was taken. It was her testimony that Doss came to visit on another occasion. During this visit, Doss wore a brown-leather jacket. Kimberly complimented Doss on the jacket and asked to wear it. She liked the fit and asked Doss to photograph her wearing the jacket.
Kimberly was questioned about a letter she received from Wal-Mart, indicating that some film she submitted for development could not be processed because it was improper. She denied having any knowledge of the contents of the film.
When asked about some notes addressed to her, which were found with the pictures, Kimberly explained that a note directing her to call "Brad" was left on her tow-motor as a joke and she did not make the call. The number on the note was to the company cafeteria. According to Kimberly, the note containing the sentence "I Love You" was written by her to James, her husband, although she could not recall whether or not she gave him the note. She could not explain the note containing the phrase "Don't worry, be happy. I love you." from Zachary Tyson. She denied knowing a person by that name. Another note containing an explicit sexual reference was addressed to Kimberly from Ted. Kimberly explained that Ted works at Spartus; she denied that he propositioned her. Instead, she testified that Doss wrote the note as a joke. She did not remember when any of them were given to her.
On direct-examination, Kimberly stated that she had never had a sexual relationship with anyone other than her husband. Kimberly testified that it was customary for the employees to "horse around" and joke. Helen Holder, a co-worker testified that horseplay was commonplace at the factory. She never witnessed anything that would lead her to believe that Kimberly was having an affair.
James testified that he was employed at Taylor Machine Works in the machine shop. He stated that the marriage began to sour in early 1990. Specifically, the couple could not agree on anything. James came across the pictures when he was looking for a check stub in Kimberly's purse. When he confronted Kimberly about them, she told him that the pictures were of "real good friends." Upon seeing the photographs and reading the notes, he was very upset, especially upon seeing Hughes in his bed. "[I]t will tear you up inside because when you love somebody ... you know, you find that they have got somebody else in your bed while you are not there, it tears you up."
On recall, Kimberly stated that she was never given a chance to explain the pictures and notes to James or his family and she was sorry that the pictures were taken. She admitted that the notes and photographs exhibited poor judgment. She remained adamant in her testimony that she never committed adultery with anyone.
At the conclusion of the evidence, the court issued its decision. After outlining the applicable law, the court held that Kimberly was infatuated with a male co-worker, had a reasonable opportunity to satisfy her adulterous inclinations and had a loose and immoral life-style. Consequently, the court granted James a divorce on the ground of adultery. The court also found that James was entitled to divorce on the ground of habitual cruel and inhuman treatment. Kimberly was denied a divorce on the same ground.
The court, after reviewing the Albright[3] factors, awarded custody to James. Specifically, the court found,
1. [t]hat the moral fitness of the father as opposed to the mother weighs heavily in favor of the father.
2. The father is willing and able to care for his son.
3. The work factors of the parties do not seem to favor either party since both work and have limited time to care for their child.

*699 4. Since the child is a male and is approaching the age when the influences of a father are important, this factor favors the father.
5. The other Albright factors seem to have very limited application to this case.
The final decree in accordance with the opinion was entered August 16, 1991. Aggrieved from the decision of the court, Kimberly and James appeal to this Court.

IV.
The standard of review applied to findings of a chancellor is a familiar one. This Court will not disturb those findings unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Hill v. Southeastern Floor Covering Company, 596 So.2d 874 (Miss. 1992). Reversal is permitted only in those cases where the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion. Powers v. Powers, 568 So.2d 255, 257-58 (Miss. 1990). Where the factual findings of the chancellor are supported by substantial credible evidence, they are insulated from disturbance on appellate review. Jones v. Jones, 532 So.2d 574, 581 (Miss. 1988) quoting Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Carr v. Carr, 480 So.2d 1120, 1122 (Miss. 1985).

V.
Kimberly asks that we address whether the trial court committed error in granting James a divorce on the ground of adultery. She argues that the proof was insufficient and the corroborating testimony lacking. Specifically, clear and convincing evidence was lacking on proof of adultery.
The court's most recent pronouncement in the realm of adultery is found in Dillon v. Dillon, 498 So.2d 328 (Miss. 1986). There, reiterating long accepted law, the standard employed in such cases was delineated.
[I]n order to grant a divorce on the ground of adultery, adultery must be proven by clear and convincing evidence. McCraney v. McCraney, 208 Miss. 105, 43 So.2d 872 (1950).
In Mississippi, one seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination. Owen v. Gerity, 422 So.2d 284, 287 (Miss. 1982); Magee v. Magee, 320 So.2d 779, 783 (Miss. 1975); Rodgers v. Rodgers, 274 So.2d 671, 673 (Miss. 1973). Where the plaintiff relies upon circumstantial evidence as proof for his allegations, he or she retains the burden of presenting satisfactory evidence sufficient to lead the trier of fact to a conclusion of guilty. Rodgers, 274 So.2d at 673. However, such evidence need not prove the alleged acts beyond a reasonable doubt and the plaintiff is not required to present direct testimony as to the events complained of due to their secretive nature. Bunkley & Morse's Amis, Divorce & Separation in Mississippi, § 3.09(5) 1957. Nevertheless, the burden of proof is a heavy one in such cases because the evidence must be logical, tend to prove the facts charged, and be inconsistent with a reasonable theory of innocence. Owen, 422 So.2d at 287 citing and quoting Banks v. Banks, 118 Miss. 783, 79 So. 841 (1918).
Dillon, 498 So.2d at 329-30 (emphasis added).
Furthermore, in cases concerning an allegation of adultery, the chancellor is required to make a finding of fact. Id. at 330. "Where chancellors make such findings of fact, this Court has consistently held that their decisions will not be set aside on appeal unless they are manifestly wrong." Id.
In the case at bar the trial court found that
it is logical to assume from the pictures which were introduced by the Plaintiff, coupled with admissions made by the Defendant and her witnesses, which were inescapable in view of the content of the pictures, an infatuation had developed between herself and a male co-worker. The infatuation is demonstrated by her actions both at work and in her home. Not only do her actions show this infatuation *700 with the co-worker; they show a generally loose and immoral life style.
Since the Court is satisfied that the burden of proof showing an infatuation with the alleged paramour has been met, the Court must examine the proof as it relates to a reasonable opportunity to satisfy the sex aspect. It seems important to remember that the Court must always keep in mind that this is a two prong which must be viewed as interrelated. The opportunity to satisfy part of the test is meaningless if the first part, especially the infatuation test, is not met. Since it has been shown to the satisfaction of the Court that these two parties were romantically involved, all of their physical actions toward each other are naturally viewed in this light.
The picture of the paramour lying in the bed of the parties with no other person in the photograph and dressed in sport shorts leads to some inescapable conclusions:
1. The Court can only conclude from admissions of the Defendant: that this meeting was after working hours in the home of the parties, that the paramour was dressed in a manner not normally worn in public, that the Defendant's husband was not at home nor was he told in advance or afterwards of the meeting and that the only person to testify that another person was present at the meeting was a friend of the Defendant who allegedly took the picture.
What is the logical conclusion to be drawn from the evidence of this meeting of the two friends whose infatuation for each other has already been established? It can only be that the two had a reasonable opportunity to commit adultery on this occasion.
A charge of adultery may be grounds for divorce upon a showing of either an infatuation for a particular person of the opposite sex or a generally adulterous nature on the part of the defendant. Owen v. Gerity, 422 So.2d 284, 287. Proof of either of these elements must be supported by evidence of a reasonable opportunity to satisfy the infatuation or proclivity before divorce on grounds of adultery will be granted. Id. In the case presently before us, the proof establishing infatuation is insufficient. The evidence does not rise above mere suspicion and is not inconsistent with Kimberly's assertion of innocence. While six of the pictures show Kimberly and Hughes standing next to each other, with their arms around each other, this in and of itself is not proof clear and convincing of infatuation between the two. All of these picture were taken in the work place. Both Kimberly and co-employee Holder testified that such horse-play was customary at the plant. In the photograph where Kimberly is shown wearing Hughes' jacket, she explained that at the time she tried the jacket, she was not aware that it belonged to Hughes and Hughes was not present.
The picture showing a scantily clad Hughes lying on Kimberly's and James's bed, in James' absence is more troubling, especially on the issue of opportunity to commit adultery. As evidence of infatuation, however, the photograph is less convincing. Kimberly testified that when this picture was taken, she was in another room. In accordance with the standard,
[i]f there are two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient because, to invest mere circumstance with the force of truth, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence.
Id. at 287.
Although here the conclusion of adultery appears logical, it is not inconsistent with a reasonable theory of innocence. Kimberly's explanation that she was not present in the room when the picture was taken and did not know of its existence until the film was developed is a reasonable explanation supporting her contention of innocence. Additionally, her adamant denial of an extra-marital relationship with Hughes, coupled with no convincing evidence of anything more than friendship and horse-play *701 weighs heavily in her favor. Regarding the notes, none were addressed to Kimberly from Hughes, the alleged paramour. While all were in her possession, she denied knowing two of the males mentioned in them.
Without establishing infatuation or adulterous nature,[4] one does not reach reasonable opportunity to satisfy, the prong which was shown here more clearly than either of the first elements, given that Hughes was present in the McAdory home at least one time when James was not present and also could have been on other occasions since Kimberly and her husband worked different shifts.
With the exception of the legal principles applicable to a claim of adultery, this Court has given little guidance as to what facts constitute infatuation or general adulterous nature and reasonable opportunity to satisfy. We have explained that the facts in such cases should not be detailed in court decisions, given the harm and discord that could result from such a printing. King v. King, 191 So.2d 409 (Miss. 1966).
Some guidance is received from the seminal case of Banks v. Banks, 118 Miss. 783, 79 So. 841 (1918), outlining the character of proof necessary to prove adultery. The Court wrote,
`Trifles light as air' may be sufficient to convince the jealous or the suspicious, but they do not impress the court with the same degree of credulity. Before accepting charges so seriously affecting the character of a person, the evidence must be clear and convincing.
Banks v. Banks, 118 Miss. 783, 79 So. 841 (1918). There, two witnesses testified that on two different occasions they saw the complainant and paramour together early in the morning, partially dressed. Additionally, a letter from the paramour to complainant, containing terms of endearment tending to indicate that complainant and paramour were in love was introduced into evidence. The Court was not persuaded and reversed the chancellor's finding of adultery. It held that the evidence was incompetent and should not have been admitted. Here, the evidence is even less convincing than in the Banks decision. It does not rise above mere suspicion of adultery.
The reversal on the charge of adultery does not affect the entire divorce decree or the McAdorys' marital status. The court also granted James a divorce on the ground of habitual cruel and inhuman treatment. Kimberly does not assign that as error. Thus, that part of the decree remains intact and the parties remain divorced.

VI.
As her second contention, Kimberly assigns as error that part of the chancellor's ruling awarding custody to James. She contends that she should have been granted custody of Jamie since the court did not find her to be an unfit mother and the child was of "tender years."
James responds that the polestar consideration is the best interest and welfare of the child and on the basis of that factor the chancellor correctly awarded him custody.
The Court found inter alia that the "moral fitness of the father as opposed to the mother weigh[ed] heavily in favor of the father" and granted custody to James.[5]
The evidence at trial established that both parents were fit to have custody of Jamie. Although Kimberly and her parents thought that James was a harsh disciplinarian, James denied any abusive conduct towards Jamie. Other than the allegations of abuse lodged by Kimberly against James, neither could point to any material flaws in the other which would shed light on the other's unfitness.
The chancellor found that James was more morally fit than Kimberly to care for the child. To the extent that the determination was premised on conduct evidencing an illicit affair between Kimberly and Hughes, it is erroneous. The evidence in *702 this case did not rise above mere conjecture and clearly was neither clear nor convincing on the allegation of adultery. On the facts and evidence in the record, it cannot be said that the court did not commit manifest error in granting custody to Jamie. That is not to say that an award of custody to James is not defensible under the facts of this case. We hold only to the extent that the chancellor based his decision on a finding of adultery, it is in error and the issue of custody must be retried. We reverse on that issue and remand for further proceedings consistent with this opinion.

VII.
On cross-appeal, James raises one issue for review and decision. He contends that the court erred by not ordering Kimberly to pay child support. He couches his argument as an equal protection violation specifically arguing that it is a violation of the Equal Protection Clause of the United States Constitution to not order women to pay child support when similarly situated men would be ordered to pay child support. He relies upon Orr v. Orr, 440 U.S. 268, 270, 99 S.Ct. 1102, 1104, 59 L.Ed.2d 306 (1979), where the United States Supreme Court held as violative of the Constitution an Alabama statutory scheme which provided that husbands but not wives may be required to pay alimony.
That decision has no application here. In Alabama a statute authorized different treatment. Here, there is no such statute. Additionally, nothing in the court order referenced Kimberly's sex as a reason for the court not ordering that she make such payments.
It is elementary that awards of child support are within the discretion of the chancellor. Powers v. Powers, 568 So.2d 255 (Miss. 1990). Only in cases of manifest error will the court be reversed.[6] We decline to reach the issue whether the failure to award child support in the instant case is manifest error. Because we are remanding for reconsideration of the issue of custody, we also reverse the judgment as to child support and remand that issue for reconsideration.

CONCLUSION
We reverse that part of the divorce decree granting James a divorce on the ground of adultery. Because we cannot say that the matters pertaining to custody are not based on that finding, we reverse as to those issues and remand for proceedings consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, PITTMAN and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
NOTES
[1] Kimberly was employed at Spartus Industries. She worked from 7:00 a.m. to 3:00 p.m., Monday through Friday. James was employed by another company and he worked from 3:30 p.m. until 12:00 a.m.
[2] Kimberly is shown "giving the finger".
[3] Albright v. Albright, 437 So.2d 1003 (Miss. 1983).
[4] The chancellor did not address this element in his findings.
[5] See discussion in procedural history section supra outlining the chancellor's findings with regard to custody.
[6] The statute empowering the chancellor to award child support is discretionary. Section 93-5-23 (Supp. 1991) of the Code provides in pertinent part,

When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody and maintenance of the children of the marriage ...
Id. Here, the court made no findings with regard to support payments. In fact, nothing in the opinion or decree even addresses support payments even though both parties requested such relief in their complaints for divorce. In other cases where a chancellor has neglected to make factual findings on issues of fact, this Court has assumed that the issues were resolved in favor of the non-moving party. Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985).
We make no such assumptions, since all matters pertaining to custody are reversed and remanded.