IN THE SUPREME COURT OF MISSISSIPPI
NO. 94-CA-00013-SCT

*JERRY W. HOLDEN*

*v.*

*JULIE M. FRASHER-HOLDEN*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/02/93 |
| TRIAL JUDGE: | HON. JASON H. FLOYD JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WOODROW W. PRINGLE, III |
| ATTORNEY FOR APPELLEE: | WALTER W. TEEL |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 9/5/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/26/96 |

**BEFORE DAN LEE, C.J., McRAE AND SMITH, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This case arises from a December 2, 1993, order of the Harrison County Chancery Court granting Julie M. Frasher-Holden a divorce from Jerry W. Holden on grounds of adultery and awarding her past due spousal support, alimony and attorney fees and dismissing Jerry's complaint for divorce. Jerry asserts that the evidence presented merely gives rise to a suspicion of adultery and thus, the chancellor erred in granting Julie a divorce on those grounds. He does not challenge the awards of past due support, periodic alimony or attorney fees. Finding that there is sufficient evidence of infatuation and the opportunity to satisfy that infatuation, we affirm the decision of the chancery court.

I.

¶2. Julie and Jerry Holden were married in Springfield, Missouri, on September 6, 1978. Although both have children from prior marriages, no children were born of this union. The couple separated in April, 1992, in Gulfport, Mississippi.

¶3. On April 12, 1992, Jerry filed a Complaint for Divorce in the Chancery Court of the First Judicial District of Harrison County. He sought a divorce on grounds of irreconcilable differences, pursuant to Miss. Code Ann. § 93-5-2, or, in the alternative, habitual cruel and inhuman treatment, pursuant to Miss. Code Ann. § 93-5-1. Julie filed an answer and counterclaim on May 26, 1992, seeking separate

maintenance, or in the alternative, a divorce on grounds of adultery, or, again, in the alternative, irreconcilable differences. She further requested temporary support and attorney fees, as well as lump sum and periodic alimony. On July 21, 1992, the chancellor ordered Jerry to pay temporary support for the months of July, August, and September, 1992. An order finding Jerry in contempt for failure to comply with the support order, as well as failure to appear before the court, was entered on September 9, 1992.

¶4. A hearing was held on December 2, 1993. Julie testified that she was not aware that Jerry was unhappy. Upon returning from a visit to her mother's home in Arkansas, however, she was served with divorce papers. The next day, she found her telephone and car phone disconnected and an order entered to turn off her utilities.

¶5. Checking over the bills in the mailbox, Julie discovered many phone calls to Tuscaloosa, Alabama. She testified:

> So when I got that phone bill I saw that Tuscaloosa number so I called it and it was a lady that came on an answering machine and I thought, well, now that wouldn't be a motel or something, I don't think, so I called again. Mr. Holden answered the phone and I said who is this. He said this is Jerry.
>
> Q. Did you recognize his voice?
>
> A. Yes, sir. He said who is this? I said this is your wife. He said how did you get this number? I said off of the phone bill. And I just talked to him for a minute. He talked ugly, you know. He said I'll see you in court. I said that's fine. I'll look forward to it.

She got the name and address of the party with the phone number in question from a telephone operator, and at some time later, drove to Tuscaloosa to check out the house and talk with the neighbors. On another occasion, she testified, she saw Jerry pull out of the garage of the house in his red pick-up truck with the woman who lived there, Bonnie Robbins.

¶6. Julie further testified that when she and her friend, Francis Acock, saw Jerry's Airstream travel trailer parked at the Red Barn Campground on Highway 49 shortly after he filed for divorce, they decided to stop and get her summer things. Inside the trailer, she found:

> The closet was full of women's clothes, women's underwear was in the drawers where I kept my stuff. His stuff was in there. Her curling iron and things -- all things like that were in there. All of my bedspreads, everything like that had been removed and apparently, you know, looked like probably her stuff because it was pink. I don't think it would belong to him.

She also found cards from Bonnie addressed to "my husband to be" and "my dear Jerry W."

¶7. Sheila Ray testified that she saw Jerry with his arm around Bonnie at a car show in July, 1991, but had not told Julie because "[t]hat is not a thing a hairdresser does."

¶8. In his deposition, Jerry, who did not appear at the hearing, stated that Bonnie had spent the night in the trailer five or six times and that he had spent the night at her house, but denied having had sexual relations with her. He admitted that they had kissed, hugged and danced. He denied that the

two had a "love affair," instead characterizing their relationship as a "close friendship." Throughout his deposition, Jerry often evaded counsel's questions, testifying, for example:

Q. [by Mr. Teel] I'm not trying to trick you about that. Have you ever talked to Bonnie about potential plans for the two of you to get married?

A. It's been discussed.

Q. Is she a nice person?

A. Yes, she is.

Q. You obviously care about her.

A. Yes.

Q. You have expressed love and caring for her and she has expressed love and caring for you, is that correct?

A. Her whole family has, yes.

Q. I'm talking about her in particular.

A. Yes.

Q. That would be true, wouldn't it?

A. Yes.

* * *

Q. Yes, sir. You've told us that you care about her and you love her. When did this love start?

A. I didn't say that I loved her.

Q. You told me under oath a minute ago--

A. No, sir, I did not. Let's don't mix up the questions, o.k.? I'll be honest with you if you're honest with me.

Q. Mr. Holden, I'm not trying to trap you. A minute ago I asked you if you loved and cared about her and you said yes.

A. I do care about her.

Q. Were you telling the truth when you said you loved and cared about her?

A. I said I cared about her. I do care about her.

Q. You also said you loved her.

A. But you indicated there was a big love affair going on which there aren't [sic].

Q. You don't call going out to dinner, dating this lady, sleeping over at her house, her sleeping over at your place, her buying you presents, your talking about marriage, your telling me that you love and care for her, you don't call that a love affair?

A. No, sir.

\* \* \*

Q. What do you call it, Mr. Holden?

A. I call it close friendship.

¶9. Without making any finding of facts, the chancellor awarded Julie a divorce on the ground of adultery and dismissed Jerry's complaint for divorce with prejudice.

## II.

¶10. Where allegations of adultery are raised as grounds for divorce, the chancellor is required to make findings of fact. **McAdory v. McAdory,** 608 So. 2d 695, 699 (Miss. 1992); **Dillon v. Dillon**, 498 So. 2d 328, 330 (Miss. 1986). This Court will not set aside such findings on appeal unless they are manifestly wrong. **Id.** Where the chancellor has failed to make his own findings of fact and conclusions of law, this Court will "review the record *de novo.*" **Brooks v. Brooks**, 652 So. 2d 1113, 1118 (Miss. 1995)(chancellor did not make his own findings, rather adopted litigant's findings and applied wrong legal standard).

## III.

¶11. Jerry Holden does not complain of the chancellor's failure to make specific findings of fact or even the award of alimony and attorney fees to his former wife. Rather, on appeal, he asserts only that the chancellor should not have granted a divorce on grounds of adultery because the evidence presented was not sufficient to prove adultery; rather, it only gave rise to a suspicion of adultery. His entire argument is based on a comparison of the facts in **McAdory v. McAdory**, 608 So. 2d 695 (Miss. 1992) and **Banks v. Banks,** 118 Miss. 783, 79 So. 841 (1918).

¶12. "A charge of adultery may be grounds for divorce upon a showing of either an infatuation for a particular person of the opposite sex or a generally adulterous nature on the part of the defendant." **McAdory**, 608 So. 2d at 700. There must be evidence of one or the other before a divorce may be granted on these grounds. **Id.** In **Brooks**, this Court recited the proper evidentiary standard to be applied to the proof set forth by the complaining party, as articulated in **Dillon**:

> In Mississippi one seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination. **Owen v. Gerity**, 422 So. 2d 284, 287 (Miss. 1982); **Magee v. Magee**, 320 So. 2d 779, 783 (Miss. 1975); **Rodgers v. Rodgers**, 274 So. 2d 671, 673 (Miss. 1973). **Where the plaintiff relies on circumstantial evidence as proof for his allegations, he or she retains the burden of presenting satisfactory evidence sufficient to lead the trier of fact to a**

**conclusion of guilt.** *Rodgers*, 274 So. 2d at 673. However, such evidence need not prove the alleged acts beyond a reasonable doubt and **the plaintiff is not required to present direct testimony as to the events complained of due to their secretive nature.** Bunkley & Morse's Amis, *Divorce & Separation in Mississippi*, § 3.09(5)(1957). Nevertheless, the burden of proof is a heavy one in such cases because the evidence must be logical, tend to prove the facts charged, and be inconsistent with a reasonable theory of innocence. *Owen*, 422 So. 2d at 287, citing and quoting *Banks v. Banks*, 118 Miss. 783, 79 So. 841 (Miss. 1918).

*Brooks,* 652 So. 2d at 1116 (quoting *Dillon*, 498 So. 2d at 330)(emphasis added).

¶13. "'Adultery may be shown by evidence or admissions and either are sufficient to support a decree of divorce.'" *Brooks*, 652 So. 2d at 1119 (quoting *Jordan v. Jordan,* 510 So. 2d 131,132 (Miss. 1987)). Looking *de novo* at the record, as we must, since the chancellor did not make any specific findings of fact, there is substantial evidence that something more than a casual friendship existed between Jerry and Bonnie. Julie presented evidence of Jerry's phone calls to Bonnie; that Bonnie had stayed with Jerry in his travel trailer and kept her things there; that Jerry had stayed in Bonnie's home in Alabama; and that on at least one occasion, through the sentiment expressed on a greeting card, she had addressed him as her husband-to-be. There was testimony that Jerry and Bonnie had walked around a car show arm-in-arm. Although Jerry denied having had sexual relations with Bonnie, he admitted that she had spent the night in the trailer and he, at her house. His answers throughout the deposition were consistently evasive; at times, unresponsive. Yet, he admitted that he and Bonnie had kissed, hugged and danced, that he cared about her, and that marriage had been discussed. Merely a close friendship?

¶14. In *McAdory*, we reiterated that the elements of infatuation or proclivity toward adulterous behavior "must be supported by evidence of a reasonable opportunity to satisfy the infatuation or proclivity . . . ." *Id.* at 700. That Jerry traveled frequently in his work, often staying in Tuscaloosa where Bonnie lived provided him with ample opportunity to spend time away from home and Julie. Moreover, he admitted that he and Bonnie had spent the night in her home and his travel trailer, and Julie testified that she had found Bonnie's clothes and personal items in the closets and drawers of the trailer. Surely there was more than a reasonable opportunity to satisfy whatever urges stirred between the two.

¶15. Where two or more reasonable theories may be drawn from the evidence presented, we have found that while a conclusion of adultery may be logical, it also must be inconsistent with a reasonable theory of innocence. *McAdory*, 608 So. 2d at 700. Jerry contends that the evidence presented merely raises a "suspicion of adultery." In his deposition, as evasive as his answers often appeared to be, he did not deny his involvement with Bonnie; rather, he merely insisted on characterizing it as a "close friendship" rather than a "love affair." As distinguished from the facts in *McAdory,* where pictures of the wife hugging co-workers and often-sexually explicit notes addressed to her were characterized as customary of the "horseplay" that went on at the factory where she worked, there is no "innocent" explanation for the evidence and admissions in the case *sub judice*. Moreover, as distinguished from *Banks*, upon which Jerry also relies, there is more than mere rumor and innuendo to support the claim of adultery. Whether the evidence in this case supports a finding that a "close friendship" rather than a "love affair" existed between Jerry and Bonnie is a matter of semantics. The evidence is sufficient to support the chancellor's grant of a divorce on grounds of

adultery. Accordingly, we affirm the chancellor's decision.

¶16. **JUDGMENT AFFIRMED.**

**PRATHER AND SULLIVAN, P.JJ., BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. PITTMAN, J., NOT PARTICIPATING.**