## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00672-COA

**CHESTER L. GOSSETT IV**                                          **APPELLANT**

**v.**

**TIFFANY SMITH GOSSETT**                                         **APPELLEE**

DATE OF JUDGMENT:               03/08/2016
TRIAL JUDGE:                    HON. MARIE WILSON
COURT FROM WHICH APPEALED:      WASHINGTON COUNTY CHANCERY
                                COURT
ATTORNEY FOR APPELLANT:         TONYA YEVETTE POWELL
ATTORNEYS FOR APPELLEE:         NICK CRAWFORD
                                VICKI L. GILLIAM
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
DISPOSITION:                    AFFIRMED IN PART; REVERSED AND
                                REMANDED IN PART: 06/05/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., BARNES AND TINDELL, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.     Chester Gossett filed a complaint for divorce from his wife, Tiffany Gossett, on the grounds of adultery and cruel and inhuman treatment or, alternatively, irreconcilable differences. Tiffany answered and filed a counterclaim for divorce on the same grounds. The Washington County Chancery Court dismissed both Chester's complaint and Tiffany's counterclaim. On appeal, Chester argues the chancellor erroneously dismissed his divorce complaint because he presented sufficient evidence to establish both fault-based grounds.

¶2.     Upon review, we find no manifest error in the chancellor's determination that Chester

failed to sufficiently prove cruel and inhuman treatment. We therefore affirm that portion of the chancellor's judgment. As to Chester's adultery allegation, however, we find the chancellor misapplied the relevant legal standard. We therefore reverse the portion of the chancellor's ruling regarding Chester's adultery claim and remand the case for further proceedings consistent with this opinion.

**FACTS**

¶3.     Chester and Tiffany met and began dating in 2005. Chester informed Tiffany that he had served thirteen years in prison before being released in 2004 and placed on lifetime supervised parole. The couple dated for almost two years before marrying in 2007. Their daughter was born in June 2011, and in May 2012, the couple bought a home just down the street from Chester's mother's home. Chester's mother, who was a retired teacher, often watched the parties' daughter while the parties worked.

¶4.     The parties' marriage began to deteriorate in March 2014, leading to their eventual separation in December 2014. On March 25, 2015, Chester filed his divorce complaint, and on April 29, 2015, Tiffany answered and filed her counterclaim for divorce. Each party asserted the fault-based grounds of adultery and cruel and inhuman treatment or, alternatively, irreconcilable differences. On June 30, 2015, the chancellor entered an order granting Tiffany temporary custody of the parties' daughter and granting Chester scheduled visitation. Following a one-day trial, the chancellor entered a final judgment on March 9, 2016, that denied the parties' requested relief, dismissed their divorce filings, and terminated the temporary-relief order. Aggrieved by the dismissal of his divorce complaint, Chester

2

appeals.[1]

## STANDARD OF REVIEW

¶5.     In domestic-relations cases, this Court's review is limited. *Williams v. Williams*, 224 So. 3d 1282, 1284 (¶5) (Miss. Ct. App. 2017). We leave the chancellor's factual findings undisturbed unless the chancellor was manifestly wrong or clearly erroneous or applied an incorrect legal standard. *Id.* Where substantial evidence supports the chancellor's findings, we will not reverse the decision on appeal. *Smith v. Smith*, 90 So. 3d 1259, 1262 (¶7) (Miss. Ct. App. 2011). However, we review the chancellor's interpretation and application of the law de novo. *Id.* at (¶8).

## DISCUSSION

¶6.     Chester argues the chancellor erred by denying his divorce claim because he presented sufficient evidence to establish both adultery and cruel and inhuman treatment. We find no manifest error in the chancellor's ruling as to the issue of cruel and inhuman treatment. We therefore turn to Chester's claim regarding adultery.

¶7.     To establish adultery, a party "must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination." *Larson v. Larson*, 122 So. 3d 1213, 1215 (¶4) (Miss. Ct. App. 2013) (quoting *Atkinson v. Atkinson*, 11 So. 3d 172, 177 (¶20) (Miss. Ct. App. 2009)). "Establishing an 'adulterous inclination' requires proof of either the defendant's infatuation with a particular person or general adulterous propensity." *Id.* (citing *Lister v. Lister*, 981 So. 2d 340, 344 (¶23) (Miss. Ct. App.

---

[1] As necessary, we relay any additional facts during our analysis and discussion of the issues.

3

2008)). The plaintiff may prove adultery by either direct evidence or, because of the conduct's inherently secretive nature, circumstantial evidence. *Id.*

¶8. Where a party relies on circumstantial evidence to prove an allegation of adultery, the Mississippi Supreme Court has explained:

> [H]e or she retains the burden of presenting satisfactory evidence sufficient to lead the trier of fact to a conclusion of guilty. However, such evidence need not prove the alleged acts beyond a reasonable doubt[,] and the plaintiff is not required to present direct testimony as to the events complained of due to their secretive nature. Nevertheless, the burden of proof is a heavy one in such cases because the evidence must be logical, tend to prove the facts charged, and be inconsistent with a reasonable theory of innocence.

*McAdory v. McAdory*, 608 So. 2d 695, 699 (Miss. 1992) (citations omitted). Our caselaw further recognizes that "[t]he chancellor must set forth specific findings of fact and conclusions of law with regard to an allegation of adultery." *Larson*, 122 So. 3d at 1215 (¶4).

¶9. In the present case, Chester testified the parties' marital problems significantly escalated in March 2014 after Tiffany grew increasingly secretive, distant, and argumentative. Chester stated that Tiffany began to frequently leave the house without telling him where she was going or what she was doing and that she would stay out until 3 or 4 a.m. two to three nights a week. When he asked Tiffany about her whereabouts, Chester testified that she became argumentative. Chester further stated that, even when home, Tiffany spent most of her time in a different room from him and their daughter and constantly talked or texted on her phone. To corroborate his testimony, Chester offered into evidence several videos he filmed that showed the date, the time, and Tiffany's absence from the home

4

on those occasions. Although Tiffany claimed that she only stayed out until around midnight or 1 a.m., she corroborated Chester's testimony about her frequent absences. Tiffany further acknowledged that she often left the marital home at night because she "hated to be at home with [Chester]."

¶10. In addition to coming home at all hours of the night, Chester testified that Tiffany stopped showing him any affection or respect. According to Tiffany's own testimony, she began to sleep in a separate bedroom and refused to have sex with Chester for about a year before the parties separated. When Chester tried to come into her bedroom, Tiffany stated that she moved to the couch or to another bedroom.

¶11. The parties officially separated around December 2014 when Chester moved out of the marital home. Following the separation, Chester testified that he received a text-message alert around midnight on January 23, 2015. The alert indicated that $163 had been withdrawn from the parties' joint checking account at a local casino. According to Chester, this was the approximate amount needed to rent a room at the casino's hotel. After arranging for his mother to watch his daughter, Chester drove to the casino, where he discovered Tiffany's car in the parking lot. Around 8 a.m., Chester filmed Tiffany and a man leave the casino together. Chester identified the man as Marcus McElvane, a former customer of Tiffany's when she worked at Lowe's. Chester testified that McElvane drove Tiffany's car to McElvane's mother's house, where McElvane exited the car. Chester offered the video of Tiffany and McElvane into evidence to corroborate his accusations that the two were having an affair. According to Chester, McElvane carried two overnight bags, one of which

was pink, to Tiffany's car. Chester testified that he recognized the pink bag as one that belonged to Tiffany.

¶12. During her cross-examination, Tiffany admitted that she was at the casino on the night in question, that McElvane was also present, and that, even though the parties were strapped for cash, she spent about $200 of their money. Tiffany denied, however, that she used the money she withdrew to rent a hotel room or that the pink overnight bag McElvane carried to her car belonged to her. Instead, Tiffany testified that she spent the entire evening gambling in the casino and never set foot in one of the casino's hotel rooms. Tiffany further explained that she allowed McElvane to drive her car the next morning because she was tired from gambling all night.

¶13. Along with the photos from the casino, Chester produced three photos of a package Tiffany received in March 2015. Although the parties were still married at the time, the package was addressed to Tiffany's maiden name. Furthermore, even though the package was actually shipped from Riverdale, Maryland, where McElvane lived, the package provided Tiffany's home address as the return address. On cross-examination, Tiffany testified that her aunt, who lived in the same area of Maryland as McElvane, had sent the package and addressed it as Tiffany instructed. Tiffany further stated that the package contained clothes for the parties' daughter.

¶14. In addition to observing Tiffany and McElvane leave the casino together, Chester testified that he had seen the two together "quite a bit." Chester stated that McElvane had "been coming and going from [the marital] house just like he's supposed to stay there[.]" As

6

support for his claims, Chester offered the testimony of his mother, Evelyn Gossett, who stated that she saw someone leave the marital home one morning after the parties had separated and that she recognized the departing vehicle as McElvane's car. According to Evelyn, she was familiar with McElvane because she knew his mother and had known McElvane since he was a child. Chester also produced two photos taken in June 2015 that showed Tiffany and McElvane sitting and talking together at a club. Although Tiffany denied any wrongdoing when asked about these photos, she admitted that, at the time the pictures were taken, she and McElvane met at the club every Thursday evening.

¶15.   Based on the evidence presented, the chancellor acknowledged that one could logically conclude Tiffany committed adultery with McElvane. Even so, the chancellor ultimately found the evidence did not support only a finding of guilt but could also be consistent with a reasonable theory of innocence. With regard to the casino incident, the chancellor reasoned that, because McElvane lived in Maryland, it was "not unreasonable for him to stay at a casino hotel, particularly if he planned on staying out late." The chancellor drew this conclusion even though McElvane's mother lived in the area and McElvane carried to Tiffany's car two overnight bags, one of which was pink. Though she found the pink overnight bag suspicious, the chancellor still concluded it was "not unreasonable for [McElvane] to have two overnight bags." The chancellor also reasoned that "[i]t [was] not unknown for people to gamble at a casino all night[,] and [it was] not unreasonable that a man would drive for a woman who ha[d] been up all night gambling[.]" With regard to Chester's remaining evidence, the chancellor found that much of it was uncorroborated and

7

that Chester could not satisfy his burden merely with "he said, she said" testimony. As a result, without ever making a determination as to witness credibility, the chancellor concluded that Chester failed to sufficiently prove adultery.

¶16. Upon review, we find the chancellor misapplied the relevant legal standard to Chester's adultery allegation. The chancellor determined that Chester presented insufficient evidence of adultery because his proof did "not lead one *only* to the conclusion of guilty[.]" However, the chancellor's ruling failed to take into account that, as the factfinder, she possessed the authority to determine witness credibility, to resolve discrepancies in the evidence, and to interpret the evidence "where it is capable of more than one reasonable interpretation[.]" *Betts v. Betts*, 224 So. 3d 94, 98 (¶16) (Miss. Ct. App. 2016) (quoting *Trim v. Trim*, 33 So. 3d 471, 479 (¶20) (Miss. 2010)).

¶17. Unlike the dissent sets forth, we do not find the chancellor applied an erroneous legal standard. Rather, as stated, we find the chancellor misapplied the correct legal standard. The dissent relies heavily on *Mitchell v. Mitchell*, 767 So. 2d 1037, 1041 (¶12) (Miss. Ct. App. 2000), for the premise that proof of adultery in a circumstantial-evidence case must "lead one *only* to the conclusion of guilt[.]" However, such a holding would require an even higher evidentiary standard than that of beyond a reasonable doubt when, in cases such as this, the applicable standard is clear and convincing evidence. *See McAdory*, 608 So. 2d 699. In *McAdory*, which *Mitchell* cites, the supreme court never stated that the proof in a circumstantial-evidence case must lead the factfinder *only* to a conclusion of guilt. Instead, *McAdory* provided that a party seeking to prove adultery must do so by clear and convincing

8

evidence and to the exclusion of any reasonable theory of innocence. *See id.* To the extent that *Mitchell* implies otherwise, *Mitchell* misapplies the correct legal standard of clear and convincing evidence discussed in *McAdory*. *See id.*

¶18.     As the chancellor here acknowledged, the parties' evidence might be capable of more than one reasonable interpretation. However, as discussed, such a fact does not automatically demonstrate a failure by Chester to present sufficient evidence of adultery. On remand, the chancellor should exercise her factfinding authority to assess witness credibility and to interpret the evidence. *See Betts*, 224 So. 3d at 98 (¶16). In so doing, if the chancellor finds Tiffany to be more credible, then she may conclude that Chester did, in fact, fail to present sufficient evidence of adultery. However, if the chancellor determines Chester to be the more credible witness, then she may find he provided sufficient evidentiary support for his adultery claim.

## CONCLUSION

¶19.     We find no manifest error in the chancellor's determination that Chester presented insufficient proof of cruel and inhuman treatment. We therefore affirm that portion of the chancellor's judgment. However, with regard to Chester's adultery allegation, we find the chancellor misapplied the relevant legal standard. We therefore reverse that portion of the chancellor's judgment so that, on remand, the chancellor may exercise her factfinding authority. On remand, the chancellor should determine witness credibility and interpret and resolve conflicts in the evidence to determine whether Chester presented sufficient evidence of adultery.

¶20. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES AND CARLTON, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. FAIR, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON AND GREENLEE, JJ.; WESTBROOKS, J., JOINS IN PART.**

**FAIR, J., DISSENTING:**

¶21. The majority reverses the chancellor's judgment based on its finding that the chancellor "misapplied" the legal standard for proof of adultery. In fact, the chancellor was quoting from one of our decisions, *Mitchell v. Mitchell*, 767 So. 2d 1037, 1041 (¶12) (Miss. Ct. App. 2000), which the majority would overrule. In my judgment, *Mitchell* was just paraphrasing the rule followed by Mississippi Supreme Court for a hundred years. I can find no error in the legal standard, as the chancellor articulated or applied it, and I would affirm the chancery court's judgment.

¶22. In particular, the majority finds objectionable the chancellor's holding that Chester's "proof did not lead one *only* to the conclusion of guilty." *Ante* at (¶16) (emphasis in original). That is nearly a word-for-word quote from *Mitchell*, 767 So. 2d at 1041 (¶12), including the emphasis: "The circumstantial evidence presented by Eddie does not lead one *only* to the conclusion of guilt as required by case law." According to the majority, *Mitchell* should be overruled on that point because it erroneously applied the legal standard from *McAdory v. McAdory*, 608 So. 2d 695, 699 (Miss. 1992), which *Mitchell* cited. In *McAdory*, the supreme court stated that the circumstantial proof of adultery must "*be inconsistent with a reasonable theory of innocence.*" *McAdory*, 608 So. 2d at 699 (emphasis in original).

10

Since one can only be innocent or guilty of adultery, and if the proof must be "inconsistent with a reasonable theory of innocence," it follows that sufficient proof must *only* lead to the conclusion of guilt. *Mitchell*, 767 So. 2d at 1041 (¶12). In my judgment, the two statements are logically equivalent.

¶23. The particular articulation of the rule used in *McAdory* and *Mitchell* dates to at least 1918, when the supreme court held in *Banks v. Banks*, 118 Miss. 783, 788, 79 So. 841, 842 (1918), that the proof "must be inconsistent with a reasonable theory of innocence." It is instructive to read the supreme court's holding in *Banks* more fully, with my emphasis added:

> Where an offense of this kind is sought to be proven by circumstantial evidence, the circumstances must be proven with reasonable certainty, and the circumstances so proven must be such that the conclusion sought to be established follows logically from the facts. **If there are two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient** because, to invest mere circumstances with the force of truth, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence.

*Id.* at 787-88, 79 So. at 842.

¶24. The majority actually concedes that "the parties' evidence might be capable of more than one reasonable interpretation." *Ante* at (¶18). If that is the case, then "the proof will be insufficient" under *Banks* because "there are two or more reasonable theories which may be drawn from the facts proven." *Banks*, 118 Miss. at 787, 79 So. at 842.[2] The proof fails under *McAdory* because the evidence was not "*inconsistent with a reasonable theory of innocence*." *McAdory*, 608 So. 2d at 699 (emphasis in original). And the evidence "does not lead one

---

[2] The same language was included in *McAdory*, 608 So. 2d at 700, and other cases. *See, e.g., Owen v. Gerity*, 422 So. 2d 284, 287 (Miss. 1982); *Pool v. Pool*, 989 So. 2d 920, 925 (¶14) (Miss. Ct. App. 2008).

*only* to the conclusion of guilt." *Mitchell*, 767 So. 2d at 1041 (¶12) (emphasis in original). These are all just different ways of saying the same thing.

¶25. The majority also faults the chancellor for stating that "he said, she said" testimony is insufficient to meet the burden. This is also a quote from *Mitchell*: "[T]he burden remained on Eddie to prove his claim of adultery. . . . This burden cannot be met with only 'he said, she said' testimony alone." *Mitchell*, 767 So. 2d at 1041 (¶12) (citing *Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986)). I concede that there may be some potential for mischief in that choice of words, as *Mitchell* intended them to be a comment on the weight of the evidence required—clear and convincing—and not a statement that the chancery court lacks the authority to resolve conflicting testimony. But it is apparent to me that the chancellor knew better; she properly used the quote as a comment on the burden of proof. She wrote:

> While the proof of an adulterous affair need not be beyond a reasonable doubt, and direct evidence is not required given the inherently secretive nature of adulterous relationships, the evidence must be clear and convincing, and inconsistent with a reasonable theory of innocence. The burden remains on the Plaintiff to prove his claim of adultery. This burden cannot be met with "he said, she said" testimony alone. *Mitchell*[, 767 So. 2d at 1041 (¶12)]. Although the conclusion that the Defendant committed adultery with Marcus may be logical, the circumstantial evidence presented by the Plaintiff does not lead one *only* to the conclusion of guilt as required by case law. Therefore, the court finds that the evidentiary basis for a finding of adultery on the part of the Defendant is insufficient.

¶26. I can see nowhere in the chancellor's opinion where she denied her authority to resolve conflicting testimony, and the majority points to no example of conflicting testimony that went unresolved. In fact, there does not appear to have been any conflicting testimony

12

as to the circumstantial evidence of Tiffany's alleged adultery, as Chester's testimony as to finding his wife socializing with another man was accompanied by photographs, and Tiffany herself did not deny the socializing occurred. I can find no error here.

¶27. I would conclude that the chancellor followed well-established Mississippi law and that her judgment should stand in its entirety.

**WILSON AND GREENLEE, JJ., JOIN THIS OPINION. WESTBROOKS, J., JOINS THIS OPINION IN PART.**