TINDELL, J., FOR THE COURT:
 

 ¶ 1. Chester Gossett filed a complaint for divorce from his wife, Tiffany Gossett, on the grounds of adultery and cruel and inhuman treatment or, alternatively, irreconcilable differences. Tiffany answered and filed a counterclaim for divorce on the same grounds. The Washington County Chancery Court dismissed both Chester's complaint and Tiffany's counterclaim. On appeal, Chester argues the chancellor erroneously dismissed his divorce complaint because he presented sufficient evidence to establish both fault-based grounds.
 

 ¶ 2. Upon review, we find no manifest error in the chancellor's determination that Chester failed to sufficiently prove cruel and inhuman treatment. We therefore affirm that portion of the chancellor's judgment. As to Chester's adultery allegation, however, we find the chancellor misapplied the relevant legal standard. We therefore reverse the portion of the chancellor's ruling regarding Chester's adultery claim and remand the case for further proceedings consistent with this opinion.
 

 FACTS
 

 ¶ 3. Chester and Tiffany met and began dating in 2005. Chester informed Tiffany that he had served thirteen years in prison before being released in 2004 and placed on lifetime supervised parole. The couple dated for almost two years before marrying
 in 2007. Their daughter was born in June 2011, and in May 2012, the couple bought a home just down the street from Chester's mother's home. Chester's mother, who was a retired teacher, often watched the parties' daughter while the parties worked.
 

 ¶ 4. The parties' marriage began to deteriorate in March 2014, leading to their eventual separation in December 2014. On March 25, 2015, Chester filed his divorce complaint, and on April 29, 2015, Tiffany answered and filed her counterclaim for divorce. Each party asserted the fault-based grounds of adultery and cruel and inhuman treatment or, alternatively, irreconcilable differences. On June 30, 2015, the chancellor entered an order granting Tiffany temporary custody of the parties' daughter and granting Chester scheduled visitation. Following a one-day trial, the chancellor entered a final judgment on March 9, 2016, that denied the parties' requested relief, dismissed their divorce filings, and terminated the temporary-relief order. Aggrieved by the dismissal of his divorce complaint, Chester appeals.
 
 [1]
 

 STANDARD OF REVIEW
 

 ¶ 5. In domestic-relations cases, this Court's review is limited.
 
 Williams v. Williams
 
 ,
 
 224 So.3d 1282
 
 , 1284 (¶ 5) (Miss. Ct. App. 2017). We leave the chancellor's factual findings undisturbed unless the chancellor was manifestly wrong or clearly erroneous or applied an incorrect legal standard.
 

 Id.
 

 Where substantial evidence supports the chancellor's findings, we will not reverse the decision on appeal.
 
 Smith v. Smith
 
 ,
 
 90 So.3d 1259
 
 , 1262 (¶ 7) (Miss. Ct. App. 2011). However, we review the chancellor's interpretation and application of the law de novo.
 

 Id.
 

 at (¶ 8).
 

 DISCUSSION
 

 ¶ 6. Chester argues the chancellor erred by denying his divorce claim because he presented sufficient evidence to establish both adultery and cruel and inhuman treatment. We find no manifest error in the chancellor's ruling as to the issue of cruel and inhuman treatment. We therefore turn to Chester's claim regarding adultery.
 

 ¶ 7. To establish adultery, a party "must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination."
 
 Larson v. Larson
 
 ,
 
 122 So.3d 1213
 
 , 1215 (¶ 4) (Miss. Ct. App. 2013) (quoting
 
 Atkinson v. Atkinson
 
 ,
 
 11 So.3d 172
 
 , 177 (¶ 20) (Miss. Ct. App. 2009) ). "Establishing an 'adulterous inclination' requires proof of either the defendant's infatuation with a particular person or general adulterous propensity."
 

 Id.
 

 (citing
 
 Lister v. Lister
 
 ,
 
 981 So.2d 340
 
 , 344 (¶ 23) (Miss. Ct. App. 2008) ). The plaintiff may prove adultery by either direct evidence or, because of the conduct's inherently secretive nature, circumstantial evidence.
 

 Id.
 

 ¶ 8. Where a party relies on circumstantial evidence to prove an allegation of adultery, the Mississippi Supreme Court has explained:
 

 [H]e or she retains the burden of presenting satisfactory evidence sufficient to lead the trier of fact to a conclusion of guilty. However, such evidence need not prove the alleged acts beyond a reasonable doubt[,] and the plaintiff is not required to present direct testimony as to the events complained of due to their secretive nature. Nevertheless, the burden of proof is a heavy one in such cases
 because the evidence must be logical, tend to prove the facts charged, and be inconsistent with a reasonable theory of innocence.
 

 McAdory v. McAdory
 
 ,
 
 608 So.2d 695
 
 , 699 (Miss. 1992) (citations omitted). Our caselaw further recognizes that "[t]he chancellor must set forth specific findings of fact and conclusions of law with regard to an allegation of adultery."
 
 Larson
 
 ,
 
 122 So.3d at 1215
 
 (¶ 4).
 

 ¶ 9. In the present case, Chester testified the parties' marital problems significantly escalated in March 2014 after Tiffany grew increasingly secretive, distant, and argumentative. Chester stated that Tiffany began to frequently leave the house without telling him where she was going or what she was doing and that she would stay out until 3 or 4 a.m. two to three nights a week. When he asked Tiffany about her whereabouts, Chester testified that she became argumentative. Chester further stated that, even when home, Tiffany spent most of her time in a different room from him and their daughter and constantly talked or texted on her phone. To corroborate his testimony, Chester offered into evidence several videos he filmed that showed the date, the time, and Tiffany's absence from the home on those occasions. Although Tiffany claimed that she only stayed out until around midnight or 1 a.m., she corroborated Chester's testimony about her frequent absences. Tiffany further acknowledged that she often left the marital home at night because she "hated to be at home with [Chester]."
 

 ¶ 10. In addition to coming home at all hours of the night, Chester testified that Tiffany stopped showing him any affection or respect. According to Tiffany's own testimony, she began to sleep in a separate bedroom and refused to have sex with Chester for about a year before the parties separated. When Chester tried to come into her bedroom, Tiffany stated that she moved to the couch or to another bedroom.
 

 ¶ 11. The parties officially separated around December 2014 when Chester moved out of the marital home. Following the separation, Chester testified that he received a text-message alert around midnight on January 23, 2015. The alert indicated that $163 had been withdrawn from the parties' joint checking account at a local casino. According to Chester, this was the approximate amount needed to rent a room at the casino's hotel. After arranging for his mother to watch his daughter, Chester drove to the casino, where he discovered Tiffany's car in the parking lot. Around 8 a.m., Chester filmed Tiffany and a man leave the casino together. Chester identified the man as Marcus McElvane, a former customer of Tiffany's when she worked at Lowe's. Chester testified that McElvane drove Tiffany's car to McElvane's mother's house, where McElvane exited the car. Chester offered the video of Tiffany and McElvane into evidence to corroborate his accusations that the two were having an affair. According to Chester, McElvane carried two overnight bags, one of which was pink, to Tiffany's car. Chester testified that he recognized the pink bag as one that belonged to Tiffany.
 

 ¶ 12. During her cross-examination, Tiffany admitted that she was at the casino on the night in question, that McElvane was also present, and that, even though the parties were strapped for cash, she spent about $200 of their money. Tiffany denied, however, that she used the money she withdrew to rent a hotel room or that the pink overnight bag McElvane carried to her car belonged to her. Instead, Tiffany testified that she spent the entire evening gambling in the casino and never set foot in one of the casino's hotel rooms. Tiffany further explained that she allowed McElvane to drive her car the next morning
 because she was tired from gambling all night.
 

 ¶ 13. Along with the photos from the casino, Chester produced three photos of a package Tiffany received in March 2015. Although the parties were still married at the time, the package was addressed to Tiffany's maiden name. Furthermore, even though the package was actually shipped from Riverdale, Maryland, where McElvane lived, the package provided Tiffany's home address as the return address. On cross-examination, Tiffany testified that her aunt, who lived in the same area of Maryland as McElvane, had sent the package and addressed it as Tiffany instructed. Tiffany further stated that the package contained clothes for the parties' daughter.
 

 ¶ 14. In addition to observing Tiffany and McElvane leave the casino together, Chester testified that he had seen the two together "quite a bit." Chester stated that McElvane had "been coming and going from [the marital] house just like he's supposed to stay there[.]" As support for his claims, Chester offered the testimony of his mother, Evelyn Gossett, who stated that she saw someone leave the marital home one morning after the parties had separated and that she recognized the departing vehicle as McElvane's car. According to Evelyn, she was familiar with McElvane because she knew his mother and had known McElvane since he was a child. Chester also produced two photos taken in June 2015 that showed Tiffany and McElvane sitting and talking together at a club. Although Tiffany denied any wrongdoing when asked about these photos, she admitted that, at the time the pictures were taken, she and McElvane met at the club every Thursday evening.
 

 ¶ 15. Based on the evidence presented, the chancellor acknowledged that one could logically conclude Tiffany committed adultery with McElvane. Even so, the chancellor ultimately found the evidence did not support only a finding of guilt but could also be consistent with a reasonable theory of innocence. With regard to the casino incident, the chancellor reasoned that, because McElvane lived in Maryland, it was "not unreasonable for him to stay at a casino hotel, particularly if he planned on staying out late." The chancellor drew this conclusion even though McElvane's mother lived in the area and McElvane carried to Tiffany's car two overnight bags, one of which was pink. Though she found the pink overnight bag suspicious, the chancellor still concluded it was "not unreasonable for [McElvane] to have two overnight bags." The chancellor also reasoned that "[i]t [was] not unknown for people to gamble at a casino all night[,] and [it was] not unreasonable that a man would drive for a woman who ha[d] been up all night gambling[.]" With regard to Chester's remaining evidence, the chancellor found that much of it was uncorroborated and that Chester could not satisfy his burden merely with "he said, she said" testimony. As a result, without ever making a determination as to witness credibility, the chancellor concluded that Chester failed to sufficiently prove adultery.
 

 ¶ 16. Upon review, we find the chancellor misapplied the relevant legal standard to Chester's adultery allegation. The chancellor determined that Chester presented insufficient evidence of adultery because his proof did "not lead one
 
 only
 
 to the conclusion of guilty[.]" However, the chancellor's ruling failed to take into account that, as the factfinder, she possessed the authority to determine witness credibility, to resolve discrepancies in the evidence, and to interpret the evidence "where it is capable of more than one reasonable interpretation[.]"
 
 Betts v. Betts
 
 ,
 
 224 So.3d 94
 
 , 98 (¶ 16) (Miss. Ct. App. 2016) (quoting
 
 Trim v. Trim
 
 ,
 
 33 So.3d 471
 
 , 479 (¶ 20) (Miss. 2010)
 

 ).
 

 ¶ 17. Unlike the dissent sets forth, we do not find the chancellor applied an erroneous legal standard. Rather, as stated, we find the chancellor misapplied the correct legal standard. The dissent relies heavily on
 
 Mitchell v. Mitchell
 
 ,
 
 767 So.2d 1037
 
 , 1041 (¶ 12) (Miss. Ct. App. 2000), for the premise that proof of adultery in a circumstantial-evidence case must "lead one
 
 only
 
 to the conclusion of guilt[.]" However, such a holding would require an even higher evidentiary standard than that of beyond a reasonable doubt when, in cases such as this, the applicable standard is clear and convincing evidence.
 
 See
 

 McAdory
 
 ,
 
 608 So. 2d at 699
 
 . In
 
 McAdory
 
 , which
 
 Mitchell
 
 cites, the supreme court never stated that the proof in a circumstantial-evidence case must lead the factfinder
 
 only
 
 to a conclusion of guilt. Instead,
 
 McAdory
 
 provided that a party seeking to prove adultery must do so by clear and convincing evidence and to the exclusion of any reasonable theory of innocence.
 
 See
 
 id.
 

 To the extent that
 
 Mitchell
 
 implies otherwise,
 
 Mitchell
 
 misapplies the correct legal standard of clear and convincing evidence discussed in
 
 McAdory
 
 .
 
 See
 
 id.
 

 ¶ 18. As the chancellor here acknowledged, the parties' evidence might be capable of more than one reasonable interpretation. However, as discussed, such a fact does not automatically demonstrate a failure by Chester to present sufficient evidence of adultery. On remand, the chancellor should exercise her factfinding authority to assess witness credibility and to interpret the evidence.
 
 See
 

 Betts
 
 , 224 So.3d at 98 (¶ 16). In so doing, if the chancellor finds Tiffany to be more credible, then she may conclude that Chester did, in fact, fail to present sufficient evidence of adultery. However, if the chancellor determines Chester to be the more credible witness, then she may find he provided sufficient evidentiary support for his adultery claim.
 

 CONCLUSION
 

 ¶ 19. We find no manifest error in the chancellor's determination that Chester presented insufficient proof of cruel and inhuman treatment. We therefore affirm that portion of the chancellor's judgment. However, with regard to Chester's adultery allegation, we find the chancellor misapplied the relevant legal standard. We therefore reverse that portion of the chancellor's judgment so that, on remand, the chancellor may exercise her factfinding authority. On remand, the chancellor should determine witness credibility and interpret and resolve conflicts in the evidence to determine whether Chester presented sufficient evidence of adultery.
 

 ¶ 20.
 
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES AND CARLTON, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. FAIR, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON AND GREENLEE, JJ.; WESTBROOKS, J., JOINS IN PART.
 

 As necessary, we relay any additional facts during our analysis and discussion of the issues.