# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00321-COA

TREVOR LEE WATTS, INDIVIDUALLY AND                        APPELLANT
AS REPRESENTATIVE OF THE HEIR AT LAW
OF KIMBERLY WATTS, DECEASED

v.

THOMAS DALE WATTS                                         APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/22/2021 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | TIM C. HOLLEMAN |
| ATTORNEYS FOR APPELLEE: | ROSS DOUGLAS VAUGHN RICHARD ANTHONY FILCE |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 11/15/2022 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Trevor Lee Watts (Trevor) sued his father, Thomas Dale Watts (Thomas), for the wrongful death of his mother, Kimberly Watts (Kimberly), after she was found dead in 2014. Thomas filed a motion for summary judgment, which the trial court granted. Trevor appeals. After a review of the record, this Court holds that Trevor presented sufficient evidence to establish a genuine issue of material fact as to whether Thomas killed Kimberly. Accordingly, we reverse the order granting summary judgment and remand this case to the trial court.

## FACTS

¶2.     Kimberly Watts was murdered on the night of November 10 or 11, 2014, in her home. After not reporting to work, her brother-in-law George Bass found her body. Kimberly had been stabbed and strangled. A homicide investigation ensued but apparently was never concluded. No arrest was ever made, no criminal charges were ever filed, and no one was ever indicted. Thomas was questioned as part of the investigation but invoked his Fifth Amendment right against self-incrimination.

¶3.     Kimberly and Thomas were married in 1996. They had one child, Trevor. In 2008 Thomas filed for divorce. In 2009 they agreed to an irreconcilable differences divorce but left some issues for the chancellor to decide. After a two-day trial, the chancellor awarded joint physical and legal custody, ordered Thomas to pay to Kimberly $332 in child support each month, $1,000 a month in periodic alimony for the remainder of Kimberly's life, and $15,000 to Kimberly in attorney's fees. Thomas appealed the chancellor's decision.

¶4.     In 2012, this Court rendered an opinion addressing the issues in Thomas and Kimberly's contentious divorce. *Watts v. Watts*, 99 So. 3d 751 (Miss. Ct. App. 2012). In that appeal, this Court noted that Thomas had a history of prescription drug abuse and had been to a rehabilitation facility two times before his marriage with Kimberly ended. *Id.* at 755 (¶¶2-3). Thomas challenged the chancellor's decision requiring him to pay Kimberly permanent alimony, the award of joint custody, and the requirement for him to pay Kimberly's attorney's fees. *Id.* at 756 (¶6). This Court affirmed the judgment of the chancellor in all respects. *Id*. at 761-62, 765 (¶¶28, 33, 42).

¶5.     On November 8, 2017, Trevor filed a wrongful death lawsuit against Thomas and

2

alleged that on or about November 10, 2014, Thomas entered Kimberly's home and "proximately caused" the "death" of Kimberly. As to the allegations of killing Kimberly, Thomas "denied" those in his answer.

¶6. Written discovery was conducted. In his response to interrogatories, Thomas asserted his Fifth Amendment right and refused to answer the majority of questions or objected to the scope of the question. For example, when asked about all addresses where he has resided since January 1, 2014, Thomas objected to the scope and invoked his Fifth Amendment right to decline to answer.

¶7. Depositions were taken on May 9, 2019. Through their respective attorneys, Thomas took Trevor's deposition, and Trevor took Thomas' deposition. In Thomas' deposition, Thomas began answering questions about his work history and admitted his license was at one time "restricted" due to "drug abuse." He admitted that the drug abuse problem also resulted in two separate medical-license suspensions. Thomas also admitted to knowing where Kimberly lived in Long Beach, Mississippi, after their divorce and stated he had been there on "several occasions" to "drop Trevor off and pick up stuff and drop off stuff for Trevor." When asked how many times he had "driven by her home when on your motorcycle before November 10 or 11th 2014," his attorney objected. Thomas responded, "On Counsel's advice, I invoke my fifth amendment right not to answer." Thomas then invoked his Fifth Amendment right not to answer most questions asked after that point. He even invoked his right not to answer when asked if he owned a motorcycle on the night Kimberly was murdered.

3

¶8. On August 26, 2019, Thomas filed a motion for summary judgment. He alleged there was "no genuine issue of material fact to preclude summary judgment on all counts of Plaintiff's complaint." Thomas did not attach any exhibits in support of the motion. He did incorporate his memorandum of law and authorities "as if fully set forth herein." The memorandum, which was filed on the same day, asserted that "this motion is directed to the absence of any proof" that Thomas "caused or contributed" Kimberly's death. Further, he asserted "this lawsuit fails due to an absence of proof the Defendant was ever in the presence of Kimberly Watts on the date of her death." Trevor filed a response and attached the following: his deposition, Thomas' deposition, the affidavit of Kimberly's brother-in-law George Bass, the Court of Appeals opinion in the divorce case, and Thomas' appellate brief filed in that case.

¶9. George Bass' affidavit, claims that "[p]rior to her murder, . . . Kim expressed fear of Thomas Watts and specifically she feared he would kill her one day." Bass also stated that "Thomas Watts [was] the only person Kim ever expressed a fear of him murdering her."[1] Bass discovered Kimberly's body and explained there was no evidence of "forced entry, no evidence of burglary, sexual assault or robbery." Kimberly's purse was still on her shoulder, and nothing was missing from the home. Bass stated that "Kim normally entered her home through the garage but on this date she had entered the front door, which was strange." Bass

---

[1] This hearsay statement may be inadmissible at trial as hearsay and, as such, could not be considered during the summary judgment phase. *See Ill. Cent. R.R. Co. v. Jackson*, 179 So. 3d 1037, 1043 (¶14) (Miss. 2015) ("[T]he content of summary-judgment evidence must be admissible at trial although the evidence may be in a form, such as an affidavit, that would not be admissible."). The parties at trial, however, would have an opportunity to litigate the admissibility of that statement.

4

continued, "We later discovered that someone had turned off the circuit breaker so the garage door would not open." Further, Bass stated, "If [Kimberly] had entered the house through the garage, there would [be] no place for an assailant to hide. However, if you enter through the front door there were places to conceal yourself." Bass also stated that a bag was found "at the back door with bleach and wipes in it." Bass stated neither this bag nor its contents belonged to Kimberly.

¶10. In Trevor's deposition, he stated that his parents' relationship was "strained" after they got divorced. Trevor testified that Thomas used his "stature" as a "threatening or dismissive presence" toward Kimberly. Trevor stated that he saw Thomas "grab [Kimberly's] hair one time, grabbed her by the head." Trevor stated that the night Thomas grabbed Kimberly's head was the same night that Thomas "put a hole through . . . the wall." Trevor explained that this event occurred while Thomas and Kimberly were married, and the police were called in response to the altercation. Trevor explained that "police were . . . called to [his] house on more than on that one occasion."

¶11. Trevor stated in his deposition that after he found out his mother died, he came home and stayed with Thomas. He stated that Thomas did "not look[] upset or distraught . . . ." Trevor testified that he noticed "scratches" on both of Thomas' hands that night. Trevor stated that when he asked his father about the scratches, Thomas said that they came from a "grinding wheel." Trevor described the scratches as "gouges" and stated that they were "deep enough to leave scabs." Trevor claimed that the scratches looked like they were made from fingernails (on the tops of both hands) and in a crisscross pattern and that the scratches

5

were "not super healed."

¶12. Further, Trevor explained that a few days later, prior to Kimberly's funeral, he had set up a meeting with Thomas "at a conference room at First Baptist Long Beach Church for the purpose of discussing what happened to my mother." Trevor described the conversation:

> And then I started to ask him things along the lines of, well, what were you doing during this time? . . . Why he didn't seem more upset . . . . For instance, the question about my mother's death, he said nothing at first, and then followed up with eventually, ["]is this something that your mother's side of the family put in your head? Is this something they want you to believe? Are they making you ask these questions?["] All just diversional answers. Everything was not a yes or a no. Everything turned into a gray area.

During Trevor's deposition, he answered the following questions about the exchange with his father:

> Q: Did he deny it?
>
> A: No
>
> . . . .
>
> Q: Did he say, what the hell are you talking about? How could you say that about me?
>
> A: No.
>
> Q: He just stared back at you?
>
> A: Correct
>
> Q: He didn't deny it, didn't do anything?
>
> A: No
>
> . . . .
>
> Q: And he never has answered that question to this day, has he, about if he

6

killed her?

A:     No he has not. Everything is just a blank stare.

Trevor stated that he learned from an investigator in the Long Beach Police Department that Thomas had "turned off his cell phone during the time of the murder which prevented his whereabouts from being tracked." Trevor explained that Thomas' ability to pick a lock "far exceed[ed] the average ability of a normal person." Trevor claimed that Thomas taught him how to pick a lock at a young age and that he has seen Thomas pick locks.

¶13.   Trevor attached Thomas' deposition to his response. In addition to the circumstantial evidence, Trevor argues a closer look at some instances of Thomas' invocation of his Fifth Amendment right during his deposition further creates a genuine issue of material fact:

> Q.     On the night of November 10th of 2014, from approximately 6:00 p.m. until midnight, **can you tell me your whereabouts**?
>
> A.      I invoke my Fifth Amendment right not to answer.
>
> Q.     On the night of November 10th of 2014, from 12:01 a.m. until approximately 7:30 a.m. that morning, **can you tell me your whereabouts**?
>
> A.      I invoke my Fifth Amendment right not to answer.
>
> Q.     Did you murder your wife, Kimberly Watts, on or about November 10th of 2014?
>
> A.      I invoke my Fifth Amendment right not to answer.
>
> Q.     Did you murder your wife, Kimberly Watts, on or about the early morning of November 11th of 2014?[2]

---

[2] Kimberly was last seen alive on November 10, 2014, and was found deceased on November 11, 2014. The exact time of Kimberly's death is unknown, which is why both dates were asked about in the deposition.

7

A.    I invoke my Fifth Amendment right not to answer.

Q.    Did you stab Kimberly Watts in the chest two times on or about November 10th or 11th of 2014 at her home where you knew she lived?

A.    I invoke my Fifth Amendment right not to answer.

Q.    Did you strangle Kimberly Watts to death on or about November 10th, 2014?

A.    I invoke my Fifth Amendment right not to answer.

Q.    Did you strangle Kimberly Watts to death on or about November 11th of 2014?

A.    I invoke my Fifth Amendment right not to answer.

Q.    Can you explain to me how you had scratches on your hands after the murder of your ex-wife Kimberly Watts on or about November 10th or 11th  of 2014?

A.    I invoke my Fifth Amendment right not to answer.

Q.    Did Kimberly Watts scratch you on your hands when you were in the process of strangling and/or stabbing her on or about November 10th or 11th, 2014?

A.    I invoke my Fifth Amendment right not to answer.

**Q.    Do you admit that when Trevor asked you directly whether or not you had murdered or killed his mother that you refused to answer?**

**A.    I invoke my Fifth Amendment right not to answer.**

Q.    Did you pick the lock of Kimberly Watts' home on or about November 10th or 11th, 2014, and then hide in the home until she arrived so that you could then murder her?

A.    I invoke my Fifth Amendment right not to answer.

Q.    Did you turn off the breaker to the garage door so that she would have

to enter the front door rather than through the garage so that you could murder her on or about November 10th or 11th, 2014?

A.        I invoke my Fifth Amendment right not to answer.

(Emphasis added) (interjections omitted). Essentially, every question asked to Thomas in an attempt to obtain evidence against Thomas was deflected by Thomas' assertion of the Fifth Amendment.

¶14.    The Mississippi Court of Appeals decision in the divorce case *Watts v. Watts*, 99 So. 3d 751 (Miss. Ct. App. 2012), was also attached to Trevor's response to Thomas' motion for summary judgment. Trevor attached to his response to summary judgment a copy of Thomas' appellate brief filed in the divorce appeal. Trevor explained why the brief was relevant to the issue of summary judgment before the trial court. He stated, "In addition, so this [c]ourt can see for itself the extreme anger the Defendant held towards Kimberly Watts the plaintiff attaches hereto the Brief of Appellant in Watts v. Watts, 99 So. 3d 751 (Miss Ct. App. 2012)." Since the brief was written by Thomas' attorney and argued legal issues that were already made in the divorce appeal, it hardly seems  relevant to the legal issues in this appeal. This Court does not opine whether that brief, in fact, shows any anger as Trevor alleged.

¶15.    In opposition to Thomas' motion for summary judgment, Trevor asked the trial court to consider Thomas' pause when Trevor asked him if he killed Kimberly to be an "admission by silence." Further, he requested the trial court to give an adverse inference to each question on which Thomas invoked his Fifth Amendment right.

¶16.    In October 2019, Thomas filed a motion to compel Thomas to "testify in [the]

9

presence of the Court to determine whether the Defendant is entitled to assert [his Fifth] Amendment right against self incrimination to each individual question" that he refused to answer in his deposition and interrogatories. The trial court never issued a ruling on this motion.

¶17. On December 20, 2019, the trial court granted Thomas' motion for summary judgment, holding that Trevor failed to establish any genuine issue of material fact. Trevor filed a motion requesting the trial court to make specific findings and alternatively to amend or alter the judgment. Trevor also filed a motion for reconsideration. In February 2020, a hearing was held on the motions. The trial court granted the motion for specific findings of fact and ordered the parties to submit proposed findings.

¶18. One year later, on February 19, 2021, the trial court amended the summary judgment order with specific findings. The trial court upheld the granting of summary judgment: "Under the circumstances of this case, the court cannot find that the privilege has been waived or that Thomas' silence implies admission or entitles the plaintiff to an adverse inference." The trial court also entered an order denying Trevor's motion for reconsideration on the same day.

¶19. In March 2021, Trevor appealed from the order granting summary judgment, and the case was assigned to this Court. On appeal, Trevor raises the following issues: (1) the trial court erred by allowing Thomas to use his Fifth Amendment right against self-incrimination as a "sword" instead of a "shield" in this proceeding; (2) Thomas failed to meet his initial burden to support the motion for summary judgment, preventing the corresponding burden

from ever shifting to Trevor; (3) the trial court erred in declining to give an adverse inference to Thomas' refusal to testify after asserting his Fifth Amendment right; (4) the trial court erred in not compelling Thomas to answer the questions on a question-by-question basis in the presence of the court; and (5) the trial court erred in granting summary judgment to Thomas. Finding that the trial court incorrectly applied Mississippi law as to potential adverse inferences when the Fifth Amendment is invoked in a civil proceeding, and finding that there are genuine issues of material fact, we reverse the order granting summary judgment and remand this case to the circuit court for further proceedings consistent with this opinion.

**ANALYSIS**

¶20.    This Court reviews the grant of summary judgment de novo. *Williams v. City of Batesville*, 313 So. 3d 479 (¶7) (Miss. 2021).  Parties are responsible for the production of evidence corresponding to their respective burdens at trial.  *Daniels*, 629 So. 2d at 600. Summary judgment should only be granted when it is shown, beyond a reasonable doubt, that the non-movant would be unable to prove any facts to support his claim.  *McFadden v. State*, 580 So. 2d 1210, 1214 (Miss. 1991).

¶21.    Trevor asserts three issues on appeal relating to the manner in which the Fifth Amendment issues were addressed by the trial court.  First, did the trial court err in allowing Thomas to use his Fifth Amendment right against self-incrimination as a "sword" instead of a "shield"?  Second, did the trial court err in declining to give an adverse inference to Thomas' refusal to testify after asserting his Fifth Amendment right?  Third, did the trial

court err in not compelling Thomas to answer the discovery on a question-by-question basis in the presence of the court?[3]

¶22.    The Fifth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution of 1890 provide every citizen with the protection against self-incrimination. Both federal and state varieties of the privilege against self-incrimination are available to witnesses in criminal and civil proceedings. *In re Knapp*, 536 So. 2d 1330, 1334 (Miss. 1988) (citing *Allen v. Illinois*, 478 U.S. 364, 368, 303-04 (1986); *Lefkowitz v. Cunningham*, 431 U.S. 801, 804-05 (1977); *State Bar v. Attorney L*, 511 So. 2d 119 (Miss. 1987); *Morgan v. U.S. Fid. & Guar. Co.*, 222 So. 2d 820 (Miss. 1969)).   The privilege applies not just to courtroom testimony, but also to deposition testimony regarding "offenses for which [the witness] may reasonably expect that he may be investigated and charged." *In re Knapp*, 536 So. 2d at 1335.

¶23.    The Mississippi Legislature created a legal right for its citizens to bring civil lawsuits on behalf of their family members when another person or entity wrongfully or negligently causes the death of that family member. *See* Miss. Code Ann. § 11-7-13 (Supp. 2013). Trevor filed a civil lawsuit against Thomas under this statute for the wrongful death of Kimberly.  There is no blanket right to remain silent in civil cases. *In re Knapp*, 536 So. 2d at 1335.  A witness in a civil case must answer all questions except those that would require

---

[3] The motion to compel a question-by-question consideration by the trial court on the propriety of Thomas' Fifth Amendment assertion was never ruled on by the trial court. The trial court granted the motion for summary judgment before ever addressing the motion to compel.  This Court, therefore, does not address this issue.  Because this Court reverses the grant of summary judgment, the issue as to the motion to compel can be resolved by the trial court if raised by the parties.

him to give incriminating evidence. *Id.* "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951); *Morgan*, 222 So. 2d at 828 (citing *United States v. Housing Foundation*, 176 F.2d 665 (3d Cir. 1949)). Importantly, "the claim of privilege in a civil case is to be determined by the court and not by the witness as in a criminal case." *Morgan*, 222 So. 2d at 828 (citing *State v. Myers*, 244 Miss. 778, 147 So. 2d 334, 337 (1962)).

¶24. The Supreme Court has established a two-step process for determining whether assertions of the Fifth Amendment privilege should apply. The trial court must determine whether answering a question "might reveal that the witness is engaged in criminal activity." *In re Knapp*, 536 So. 2d 1330, 1334 (Miss. 1988) (citing *Attorney L*, 511 So. 2d at 124); *see generally McAdory v. McAdory*, 608 So. 2d 695 (Miss. 1992). The witness must answer if the answer could not be incriminatory. *Id*. Secondly, if the answers might be incriminatory, the court must determine if the witness will face "even a remote risk" of prosecution for the criminal activity. *Id.* "The privilege against self-incrimination in a civil case must be applied on a question-by-question basis." *Treasure Bay Corp. v. Ricard*, 967 So. 2d 1235, 1243 (¶34) (Miss. 2007) (citing *In re Knapp*, 536 So. 2d at 1334). Here, Thomas was a suspect in an ongoing criminal investigation into Kimberly's death. Thomas "pled the fifth" when the police attempted to interview him a short time after Kimberly's death. The questions asked during the civil discovery process certainly had the potential to incriminate Thomas

and serve as a basis for future criminal prosecutions.[4] Thomas had every right to assert his constitutional right to remain silent.

¶25.    Trevor also asserts that the trial court should have made an adverse inference against Thomas when he asserted his constitutional right to silence in response to the questions asked. The trial court refused to make an adverse inference when considering the motion for summary judgment. This Court has explained that in a civil case, "an adverse inference may be drawn from a defendant's assertion of the privilege" against self-incrimination. *Matthews v. Whitney Bank*, 282 So. 3d 786, 795 (¶31) (Miss. Ct. App. 2019); *see also Morgan*, 222 So. 2d at 828; *Bradshaw v. Bradshaw*, No. 2017-CA-01731-COA, 2019 WL 3815548 (Miss. Ct. App. Aug. 13, 2019); *Gibson v. Wright*, 870 So. 2d 1250, 1260 (¶42) (Miss. Ct. App. 2004). "In a civil case, an adverse inference may be drawn from a defendant's assertion of the privilege—i.e., it is 'permissible' for the **fact-finder** to draw such an inference." *Matthews*, 282 So. 3d at 795 (¶31) (emphasis added). The Mississippi Supreme Court has stated that the "court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried." *Mantachie Nat. Case Dist. v. Miss. Valley Gas Co.*, 594 So. 2d 1170, 1172 (Miss. 1992) (quoting *SW Drug Co. v. Howard Bros. Pharm. of Jackson Inc.*, 320 So. 2d 776, 779 (Miss. 1975)).

¶26.    In the present case, the trial court declined to make an adverse inference to Thomas' refusal to testify after asserting his Fifth-Amendment right. That was not the place of the trial court but a role reserved for the trier of fact. The law affords the trier of fact the

---

[4] There is no statute of limitations for the crime of murder in the State of Mississippi. *See* Miss. Code Ann. § 99-1-5 (Rev. 2020).

authority to decide whether to apply an adverse inference. *Bradshaw*, 2019 WL 3915548, at *4 (¶22). The trial court is not the trier of fact at the summary judgment phase but only determines whether the information provided by the nonmoving party creates a genuine issue of material fact on an essential element. *Mantachie*, 594 So. 2d at 1172. "It is reversible error for a trial court to substitute its summary judgment for a jury's consideration of disputed factual issues if material to the case." *Downs v. Choo*, 656 So. 2d 84, 85-86 (Miss. 1995) (citing *Brown v. Credit Ctr. Inc.*, 444 So. 2d 358, 366 (Miss. 1983)). The Mississippi Supreme Court has held "the non-moving party 'must rebut [the motion for summary judgment] by producing **significant probative evidence** . . . .'" *Foster v. Noel*, 715 So. 2d 174, 180 (¶35) (Miss. 1998) (emphasis added) (quoting *McMichael v. Nu-Way Steel & Supply Inc.*, 563 So. 2d 1371 (Miss. 1990)).

¶27. The question then becomes in this de novo review, did Trevor present sufficient probative evidence to establish a genuine issue of material fact as to an essential element of his wrongful death claim, namely did Thomas kill Kimberly? When reviewing a grant of summary judgment, this Court views all evidence in the light most favorable to the non-movant, including "admissions in pleadings, answers to interrogatories, depositions, affidavits, etc.," and will presume that all evidence in the non-movant's favor is true. *Downs*, 656 So. 2d at 85 (citing *Daniels v. GNB Inc.*, 629 So. 2d 595, 599 (Miss. 1993)). The party moving for summary judgment has the burden of persuading the court that there are no genuine issues of material fact and, therefore, they are entitled to summary judgment as a matter of law. *Daniels*, 629 So. 2d at 600. If there is a doubt as to whether there exists a

15

genuine issue of material fact, the non-movant receives the benefit of that doubt. *Mantachie*, 594 So. 2d at 1173.

¶28.    Here, it is important to note that Thomas attached nothing in support of his motion for summary judgment. His motion for summary judgment simply stated, "[t]here is no genuine issue of material fact to preclude summary judgment on all counts of Plaintiff's complaint." Thomas claims Trevor failed to prove Thomas was at Kimberly's home when she was murdered; therefore, Trevor had no proof from which to create a genuine issue of material fact.[5] However, Trevor responded with documentary support proving facts that he asserts created genuine issues of material fact.

¶29.    In the documentary evidence attached to the response, Trevor Watts presented evidence, not only of his father's invocation of his Fifth Amendment right, but a large amount of circumstantial evidence against Thomas. The Mississippi Supreme Court recently reaffirmed that circumstantial evidence is given the same weight as direct evidence. *Nevels v. State*, 325 So. 3d 627, 632 (¶14) (Miss. 2021). In summary, Trevor presented the following allegations among others: (1) Thomas had fingernail scratches on his hands the day after Kimberly was murdered by stabbing and strangulation; (2) Bottles of bleach and wipes were found at the back door to Kimberly's home in a bag that did not belong to Kimberly; (3) Kimberly normally entered her home through the garage door; (4) On the day of

---

[5] Our case law is replete with judgments being affirmed where murders (here, wrongful death) were proved with circumstantial evidence. *See Roberson v. State*, 199 So. 3d 660, 669 (¶38) (Miss. 2016); *Stephens v. State*, 911 So. 2d 424, 436 (¶42) (Miss. 2005). The appellate courts of this state have held circumstantial evidence can be used to prove a fact just like direct evidence would. *Nevels v. State*, 325 So. 3d 627, 632 (¶14) (Miss. 2021).

Kimberley's murder, Kimberly's garage door had been disabled, causing her to enter her home through her front door and indicating someone familiar with the home was the murderer; (5) There were no places for an attacker to hide if Kimberly came through the garage door whereas there were places for an attacker to hide if she was forced to come through the front door; (6) Kimberly's home had no signs of forced entry; (7) Thomas knew how to pick locks; (8) Thomas allegedly turned off his cell phone during the time of the murder; (9) George Bass testified under oath that there was nothing missing from the scene, indicating the lack of a random burglar; (10) Bass testified under oath that Kimberly was fully clothed when he found her, indicating the lack of a random sex crime; (11) Bass testified that when he found Kimberly, she had her purse on her shoulder, indicating a sudden assault when she walked through the front door of her home; (12) Thomas remained silent and never denied killing Kimberly when confronted by Trevor; (13) When confronted by Trevor, instead of denying he killed Kimberly, Thomas accused Kimberly's family of pushing Trevor to ask the questions; (14) At the moment of Kimberly's death, Thomas was no longer legally obligated to pay Kimberly $1,000 every month in permanent alimony; and (15) Finally, the existence of potential adverse inferences as a result of Thomas' invocation of the Fifth Amendment throughout his deposition and responses to written interrogatories. The Mississippi Supreme Court has made clear that adverse inferences are to be weighed by the trier of fact and that the trial court is not the trier of fact in the summary judgment phase. *Supra* at ¶26. Thus, the trial court should not have refused to consider the potential evidentiary value of adverse inferences in a jury trial when considering whether there are

17

genuine issues of material fact. It is important to state again that if there is a doubt as to whether there exists a genuine issue of material fact exists, the non-movant receives the benefit of that doubt. *Mantachie*, 594 So.2d at 1173.

¶30. In this case, the combination of circumstantial evidence presented plus the potential for any adverse inference, which could be considered by a trier of fact, created a genuine issue of material fact as to whether Thomas was responsible for the wrongful death of Kimberly. Accordingly, this Court finds that the trial court erred in granting summary judgment. We reverse the order granting summary judgment and this case is remanded for further proceedings consistent with this opinion.

¶31. **REVERSED AND REMANDED.**

**GREENLEE, McDONALD, McCARTY AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND CARLTON, P.J.; McDONALD, J., JOINS IN PART. SMITH, J., NOT PARTICIPATING.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶32. The majority believes that Trevor Watts put forth sufficient evidence to survive summary judgment in his wrongful death claim against his father Thomas Watts. I agree with the majority that under our current law the trier of fact can draw an adverse inference from the invocation of the Fifth Amendment. But I disagree with the majority's contention that Trevor produced any evidence to support a genuine issue of material fact regarding the essential wrongful-death element of causation. I opine that adverse inferences *alone* are insufficient to allow a claim to survive summary judgment. I write separately because this

18

case lacks any other independent evidence outside those negative inferences to support causation. Given this, I must respectfully dissent in part.

¶33.    This is a tragic case stemming from the unsolved murder of Kimberly Watts. On November 10 or 11, 2014, Kimberly (Trevor's mother and Thomas' ex-wife) was stabbed to death in her Long Beach, Mississippi home. Her body was discovered by her brother-in-law, George Bass, after her employer informed her family she had not shown up for work. A homicide investigation ensued and was still ongoing at the time of the appeal. Thomas was questioned as a part of the investigation. During his interview with the police, he invoked his Fifth Amendment right against self-incrimination. No criminal charges have been filed against Thomas or anyone else to date. The criminal case remains open.

¶34.    The wrongful death statute in Mississippi states in pertinent part:

> Whenever the death of any person or of any unborn quick child shall be *caused* by any real, wrongful or negligent act or omission . . . as would, if death had not ensued, have entitled the party injured or damaged thereby to maintain an action and recover damages in respect thereof . . . and such deceased person shall have left a widow or children . . . the person or corporation, or both that would have been liable if death had not ensued, and the representatives of such person shall be liable for damages . . . .

Miss. Code Ann. § 11-7-13 (Supp. 2013) (emphasis added). "It is essential as an element of liability under our wrongful death statute . . . that the negligence complained of shall be the proximate cause, or at least a directly contributing cause, of the death which is the subject of the suit." *Berryhill v. Nichols*, 171 Miss. 769, 158 So. 470, 471 (1935).

¶35.    In the present case, what Trevor must prove, and has failed to prove, is the essential element of causation. He has not put forth any evidence to indicate that Thomas was present

to cause or did cause or contribute to Kimberly's death on that tragic day. The majority makes much of Thomas' history of drug use and Thomas and Kimberly's contentious divorce. *Ante* at ¶¶3-14. But drug use and an acrimonious divorce is, without more, not enough to establish a genuine issue of material fact as it relates to the elements that must be proved in a wrongful death action. Also, motive is not a prima facie element of the wrongful death statute. *See* Miss. Code Ann. § 11-7-13. The majority has also presented a sum of the evidence put forth by Trevor in its opinion, listing fifteen facts Trevor points to in support of his case. *Ante* at ¶29. This list confirms that Trevor presented no evidence regarding causation (circumstantial or otherwise). The only possible evidence regarding the causation element of Trevor's claim that the majority lists are the potential adverse inferences taken from Thomas' invocation of the Fifth Amendment during his deposition and interrogatories. *Id*. I maintain that potential adverse inferences alone are insufficient to preclude summary judgment. Additionally, "[t]his essential element [of causation] must be proved as a reasonable probability. To prove no more than that it was a possibility is not a sufficient foundation for the support of a verdict or judgment." *Berryhill*, 171 Miss. 769, 158 So. at 471. Unfortunately, Trevor has failed to meet this requirement.

¶36. The majority correctly states that "an adverse inference may be drawn from a defendant's assertion of the privilege against self incrimination." *Ante* at ¶25 (internal quotation mark omitted). The majority also emphasizes that "[a] **fact-finder** [may] draw such an inference" from a party's decision to invoke his Fifth Amendment privilege. *Ante* at ¶25 (citations omitted). The majority holds that it was not the place of the trial court judge

20

to decline an adverse inference to Thomas and that the role should be reserved for the trier of fact, and thus summary judgment was inappropriate. But what I have found is persuasive federal authority holding that there are limitations on the use of adverse inferences based on the Fifth Amendment to defeat summary judgment. In determining that the invocation of the Fifth Amendment privilege, alone, is insufficient to defeat summary judgment, federal courts have attempted to protect the Fifth Amendment privilege while still allowing civil cases with probative evidence to survive summary judgment.

¶37. The Fifth Circuit Court of Appeals has acknowledged that adverse inferences may be drawn from the assertion of the Fifth Amendment in civil cases, but the court still concluded that "[a defendant's] refusal to answer the questions propounded to her in her deposition is insufficient to create an issue of material fact precluding summary judgment." *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990). In *United States v. White*, 589 F.2d 1283 (5th Cir. 1979), co-defendants were involved in parallel civil and criminal suits related to a scheme to skim money from a competitor. *Id*. at 1284-85. In that case, one defendant asserted that the state trial court effectively compelled him to waive his right against self-incrimination by ordering him to respond to a motion for summary judgment. *Id*. at 1287. In response to his argument, the Fifth Circuit stated, "[A]s an initial matter, we accept the proposition that a grant of summary judgment merely because of the invocation of the [F]ifth [A]mendment would unduly penalize the employment of the privilege." *Id*. (citing 8 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2018, at 148 (1970)). A subsequent Fifth Circuit case regarding qualified immunity used this

language from *White* to support the premise that "adverse inferences drawn from vague deposition questions are insufficient to establish a genuine issue of material fact." *Hassan v. Shaw*, 761 F. App'x 429, 432 (5th Cir. 2019) (unpublished) (citing *Gutterman*, 896 F.2d at 119; *White*, 589 F.2d at 1287). Ultimately, the Fifth Circuit has determined that an adverse inference from the refusal to answer based on Fifth Amendment privilege, without more, will not preclude summary judgment. *See Curtis v. M&S Petroleum Inc.*, 174 F.3d 661, 675 (5th Cir. 1999) (holding that regarding the element of intent, plaintiff presented no other evidence of intent than adverse inferences, which did not preclude summary judgment).

¶38.    This caselaw tracks the finding in other federal courts that "[i]nvocation of the [F]ifth [A]mendment privilege [does] not give rise to any legally cognizable inferences sufficient to preclude entry of summary judgment. The negative inference, if any, to be drawn from the assertion of the [F]ifth [A]mendment does not substitute for evidence needed to meet the burden of production." *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991) (citing *United States v. Rylander*, 460 U.S. 752, 758 (1983)); *In re Curtis*, 177 B.R. 717, 720 (Bankr. S.D. Ala. 1995) (holding that the court can add the weight of inferences to other evidence but that the invocation of the Fifth Amendment privilege, standing alone, is insufficient to constitute probative proof in plaintiff's case); *cf. S.E.C. v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998) (allowing adverse inferences to be combined with evidence to defeat summary judgment); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995) (stating that defendant's silence should be considered "in light of other evidence"); *Sebastian v. City of Chicago*, No. 05C2077, 2008 WL 2875255, at *34 (N.D. Ill. July 24, 2008) ("Before an

22

adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege."). What these cases make clear is that adverse inferences *alone*, without the benefit of other evidence, are not sufficient to defeat summary judgment. In the present case, Trevor has produced no evidence of causation in his wrongful death claim independent of possible adverse inferences. If he had, my opinion would differ. But because he points to adverse inferences alone as the sole evidence regarding causation, I do not believe his claim should survive summary judgment.

¶39.    Mississippi courts have not yet made a clear determination on this issue. However, I find our Fifth Circuit's holdings instructive. If Mississippi courts choose to follow the line of reasoning that federal courts have taken, as I believe they should, parties would be allowed to seek a remedy in a civil court where there is none in a criminal court, while at the same time protecting the crucial principles outlined in the Fifth Amendment. I maintain that our courts should follow the example of the federal courts in this matter.

¶40.    In the present case, Trevor provided no evidence of the essential element of causation. Furthermore, I do not believe adverse inferences alone are sufficient probative evidence on this essential element that would preclude summary judgment. Because the evidence is not sufficient to show that Kimberly's death was caused by Thomas' asserted negligence as the wrongful death statute requires, Trevor's claim should fail on summary judgment grounds. Accordingly, I respectfully dissent.

        **BARNES, C.J., AND CARLTON, P.J., JOIN THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**